NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0299n.06

No. 15-3655

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jun 07, 2016
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,      )
                               )
    Plaintiff-Appellee,         )
                               )
v.                             )
                               )
PETER TSAI,                    )
                               )
    Defendant-Appellant.        )

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

Before: KETHLEDGE, WHITE, and DAVIS,[*] Circuit Judges.

KETHLEDGE, Circuit Judge. Peter Tsai pled guilty to smuggling and conspiring to commit health-care fraud. The district court sentenced him to 78 months in prison. He argues that the district court improperly pressured him to plead guilty and then imposed an unreasonable sentence. We affirm the conviction and sentence.

I.

Tsai was born in Taiwan and moved with his family to Bad Axe, Michigan, where his father ran a successful obstetrics practice and his mother worked as a midwife. By his own account, he had a happy childhood as a "science and computer geek." He attended the Cranbrook School before receiving a bachelor's degree from Wesleyan University and a medical degree from the University of Alabama at Birmingham. He moved to Huntington, West Virginia for a residency at St. Mary's Hospital, and settled down as a general practitioner for the Department of Veterans Affairs.

---

[*] The Honorable Andre M. Davis, Senior Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation.

There his career began to slide. Not long after hiring Tsai, the VA fired him for "unprofessional and improper conduct, misuse of government equipment, waste of time and the accessing of unauthorized and pornographic websites." Tsai and his girlfriend, a psychiatric aide, moved across the Ohio River to start a medical-imaging center in Coal Grove, Ohio. Tsai's parents put up $900,000 for a computerized tomography (CT) scanner and assumed a $600,000 mortgage on an office building. The new Watkins-Tsai Imaging Center floundered: Tsai had trouble showing up to work, and days passed without any patients.

Tsai's parents intervened. They helped him set up a medical practice, Advanced Family Medical Center, across the hall from the imaging center. They also moved to Ohio to oversee operations, and brought in Tsai's cousin to handle patient billing. Advanced Family took off, and the imaging center's fortunes changed for the better. At first, the offices' stock-in-trade was the treatment of purportedly arthritic knees: Tsai would "diagnose" his Advanced Family patients, including teenagers as young as 15, with osteoarthritis after briefly touching their knees. Then he would direct them to the imaging center so that the patients could receive injections of Synvisc (an arthritis medication), guided by unnecessary CT scans of their knees.

After focusing for several years on his patients' knees, Tsai started diagnosing nearly all of his patients with piriformis syndrome, a rare condition that causes pain in the lower back and legs. These diagnoses too would create work for his CT scanner, since piriformis treatments required a general scan of the patient's hip and another scan to guide Tsai's injection of lidocaine and steroids into the patient. Many of Tsai's patients returned for repeated steroid injections and CT scans. One patient received 85 scans over a period of three years. Tsai kept his patients coming back by making their prescriptions for pain medications contingent on more scans and injections. Tsai diagnosed piriformis quickly—usually after a quick touch of the patient's

back—and liberally. An Advanced Family employee testified at trial that Tsai once walked into the clinic's waiting room near the end of a workday and went around to each patient, saying "You need a shot"; "You need a shot"; "You need a shot." One person in the waiting room at that time went to the front desk after Tsai told her she needed a shot and said, "I'm not even a patient here."

Tsai's billing practices were no more discreet. He submitted most of his claims to Medicare under two billing codes, 77011 and 77012, covering different kinds of CT scans. In September 2009, a federal contractor hired to root out Medicare fraud noticed that Watkins-Tsai had submitted 96% of all the 77011 claims in the State of Ohio in 2008. In June 2011, agents from various state and federal agencies obtained a warrant to search Tsai's clinic and the imaging center. They seized office records, computer hard drives, and Synvisc boxes bearing French and Turkish labels, along with empty, discarded Synvisc boxes marked "Approved for Canada Only." Investigators eventually concluded that between 2005 and 2011, Tsai and his parents had billed Medicaid and Medicare for approximately $2 million in unnecessary medical procedures. Investigators also surmised that, to cut costs, Tsai had illegally imported and administered Synvisc that was not approved for use in the United States.

A federal grand jury indicted Tsai, his parents, and his cousin for health-care fraud and conspiracy to commit health-care fraud. *See* 18 U.S.C. §§ 1347, 1349. The grand jury charged Tsai with additional counts of smuggling and money laundering related to the purchase of the foreign Synvisc. *See* 18 U.S.C. §§ 545, 1956(a)(2)(A); 21 U.S.C. § 352. Tsai and the other defendants pled not guilty and went to trial in August 2014. At trial, the government presented its case through the testimony of three law-enforcement agents and six former Watkins-Tsai and Advanced Family employees, including Tsai's now-ex-girlfriend (and the mother of his three

children).  These witnesses testified that Tsai did the following:  regularly told schedulers at Watkins-Tsai to hold imaging appointment slots open for new Advanced Family patients whom Tsai had not yet even examined; ignored warnings from CT technicians and other employees regarding the health dangers of over-exposing patients, including juvenile patients, to CT radiation; performed scans and Synvisc injections on both knees of patients who complained of pain only in one knee; and performed mass "diagnoses" in the waiting room of Advanced Family.

At the end of the third day of trial, the district court dismissed the jury and asked the government about the schedule for the rest of its case-in-chief.  The government responded that it planned to call nine more witnesses.  The court asked whether there had been "any subsequent plea negotiations since I last – since we last talked in the courtroom" and whether the prosecution had "given calculations as to where you believe their clients might be on the sentencing guidelines[.]"  The government and Tsai's counsel told the court that the parties had discussed a potential sentencing guidelines range for Tsai.  The court then told counsel the following:

> All right.  I, of course, can't get involved in plea negotiations, but for whatever it's worth, my impression so far is that, and it's only part of the government's case, but I think the government seems to have a very good case.  That may change, you know, when defendants, you know, other witnesses or when defendants do something.  But if what I heard is true and it's not rebutted at all, it will affect my determinations in sentencing if the defendants are convicted.  Anything further for the day?

The government and counsel for Tsai's father told the court that they had nothing else to say.

The next day, per an agreement with the government, Tsai pled guilty to two of the indictment's four counts against him in exchange for the dismissal of the other two counts.  Under the agreement, the government recommended reducing by two levels Tsai's sentencing-

guidelines offense level in recognition of his acceptance of responsibility for his crimes. *See* U.S.S.G. § 3E1.1(a). The plea agreement stipulated that Tsai "is pleading guilty because [Tsai] is in fact guilty" and that his plea was made "freely and voluntarily" and was "not the result of force or threats or of promises apart from those set forth" in the agreement. At Tsai's change-of-plea hearing, the district court asked Tsai whether he was pleading guilty of his "own free will." Tsai answered "yes."

Ten months later, at Tsai's June 2015 sentencing hearing, Tsai's counsel discussed his client's reasons for pleading guilty midway through trial:

> [T]he matter to proceed to trial here was not made for any unprincipled reason. And it's not my intention here to argue any of the evidence that we would have presented and whatnot, but it became clear at the end of day four, I think, day three or day four, that the right thing to do was to enter a plea here and that this case wasn't going to get any better despite our original hopes. And I just want you to understand, he understood that, my client did that, and this trial did come to an end.
> And part of the hope of that, Your Honor – I understand there are issues out there of potential patient harm, not just financial – but one of the reasons that we stopped the trial was so that we didn't go further into this and make things worse.

A few minutes later, the government highlighted how things might have gotten worse for Tsai if the government had continued to present its case at trial. Specifically, "the case ended before we really got deep into the [fraudulent] billing issues," and the jury would have "heard more about the Synvisc that was bought from Turkey" and about the risks associated with the administration of improperly labeled Synvisc. The government also emphasized the following:

> another point that we hadn't gotten to in the trial was the steroid part of it. These were shots that involved steroid injections for the piriformis, and as Dr. Akbik put in his report and was going to testify, the highest dose a person is supposed to get in a year, calendar year, equals about 240 to 350 milligrams per patient per year. Some patients received between 3,000 and 6,000 milligrams over a three-year period, so they're averaging 1- to 2,000

milligrams. That's three to four times what they're allowed to have in a year for three straight years, and he would have testified about the damage that that can cause.

Meanwhile, Tsai's counsel conceded at sentencing that, "If we take a look at the nature and circumstance of the offense . . . I think this [presentence report] is actually accurate." That report included, among other things, the following conclusion:

Peter Tsai's patients who were overexposed to radiation due to the unnecessary CT scans can also be considered victims, as they trusted their doctor to make decisions for the betterment of their health; however, he showed a lack of regard for their health due to the overexposure to radiation.

When the district court sentenced Tsai, it stated that the trial testimony regarding "the abuse with the [CT] scan, the overuse of the [CT] scan, the ignoring the professionals, the women who did the CT scans and the nurses who worked there, was extremely concerning. I sometimes go to bed at night thinking to myself, 'I wonder how many people are walking around Coal Grove, Ohio, that have had way too much radiation?' And yes, it's speculative, but who knows when that's going to have a harmful effect on them." The court noted that the harm caused by Tsai's behavior was not limited to the fraud perpetrated on Medicare and Medicaid: "in addition to the money in this case, it's the harm that was done to people, the harm that was done to the patients, the harm that was done to the employees. That just can't be overlooked. And if there ever was a case that should be at the top of the guidelines, this is that case[.]" The court then sentenced Tsai to 78 months' imprisonment, which was at the top of his guidelines range.

Tsai timely appealed.

II.

A.

Tsai argues that he was "coerced" into pleading guilty when the district court commented at the end of the third day of trial that "the government seems to have a very good case." He contends that the court's comments amounted to a violation of Federal Rule of Criminal Procedure 11(c)(1), which bars courts from participating in discussions between criminal defendants and the government regarding plea agreements. Tsai never raised this argument in the district court, so he must show not only that the district court clearly erred, but also that the alleged error affected his substantial rights. *See* Fed. R. Crim. P. 11(h); *United States v. Ushery*, 785 F.3d 210, 221 (6th Cir. 2015).

The government concedes that the district court's comments regarding plea negotiations "did not follow best practices." Gov't Br. at 45. Even if one assumes that the district court violated Rule 11, however, Tsai must show that the error affected his substantial rights. And to do that Tsai must show "a reasonable probability that, but for the error, he would not have entered the plea." *Ushery*, 785 at 221 (quoting *United States v. Dominguez-Benitez*, 542 U.S. 74, 83 (2004)).

Tsai has not carried his burden here. To the contrary, his counsel's representations in the district court show that he entered a plea mid-trial because it appeared the trial would only get worse for him. As his trial counsel said at sentencing, "it became clear at the end of . . . day three . . . that the right thing to do was to enter a plea here and that this case wasn't going to get any better despite our original hopes." Entry of a plea mid-trial also spared Tsai from facing the second half of the government's case, which would have shown the serious harm that Tsai

inflicted on his patients. As Tsai's counsel acknowledged, "we stopped the trial . . . so that we didn't go further into this and make things worse."

Tsai contends that the timing of his change of plea—the day after the district court's brief comments on the merits—indicates that the court's comments caused him to plead guilty. But the change of plea also followed a full day of testimony that was devastating to Tsai's claim of innocence. As the district court later commented at sentencing, "I've never seen such an amazing array of witnesses in a case, nurses, technicians, people who had worked there, who all told exactly the same story. That usually doesn't happen. [The government] must have beat the bushes quite a bit to find those folks, because their testimony was extremely compelling." Tsai has not shown that his own trial counsel's explanation for the change of plea can reasonably be doubted. His claim is without merit.

B.

Tsai argues that the district court's sentence was procedurally unreasonable. In particular, Tsai contends that the court erred when it sentenced him to a prison term at the high end of his guidelines range based in part upon what Tsai calls the "speculative harm" that he inflicted on his patients through overexposure to radiation.

When a district court imposes a sentence, it must take into consideration "the nature and circumstances of the offense" and the "seriousness of the offense." 18 U.S.C. § 3553(a). Here, per the sentencing guidelines, the court principally based Tsai's guidelines range on the monetary harm his scheme caused the public fisc. But the district court properly concluded that this monetary loss did not capture the full seriousness of the offense, because Tsai put his patients' health at considerable risk by means of unnecessary CT scans and shots. Moreover, at sentencing, Tsai accepted the findings of the court's presentencing report, including its

conclusion that Tsai "showed a lack of regard" for the health of his patients, "who were overexposed to radiation due to . . . unnecessary CT scans." And the trial testimony showed that Tsai deliberately ignored warnings from his own employees that he was putting his patients' health in grave danger. The district court was entirely correct to consider those risks in sentencing Tsai.

Tsai also argues that his sentence is substantively unreasonable, but through his plea agreement he waived his right to make that argument.

The district court's judgment is affirmed.